No. 20-16276

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ANGEL ZEPEDA RIVAS, et al.
Plaintiffs-Appellees,

v.

DAVID JENNINGS, et al.
Defendants-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

OPENING BRIEF

ETHAN P. DAVIS
*Acting Assistant Attorney General*
SCOTT G. STEWART
*Deputy Assistant Attorney General*
WILLIAM C. PEACHEY
*Director*
JEFFREY S. ROBINS
*Deputy Director*
CHRISTOPHER A. BATES
*Senior Counsel*

WILLIAM K. LANE III
*Counsel*

SERGIO SARKANY
*Trial Attorney*
Office of Immigration Litigation
U.S. Department of Justice
Civil Division
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044

*Counsel for Defendants-Appellant*

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................1

JURISDICTIONAL STATEMENT .........................................................4

STATEMENT OF ISSUES .......................................................................6

STATEMENT OF THE CASE....................................................................7

   I.  Factual Background ......................................................................7

   II.  Procedural Background ...............................................................10

SUMMARY OF ARGUMENT ...............................................................14

STANDARD OF REVIEW .....................................................................17

ARGUMENT ..........................................................................................18

   I.  The Government is Likely to Succeed on The Merits...................18

      A.  Habeas Corpus is Not a Proper Vehicle for Plaintiffs to Challenge Their Conditions of Confinement and Release is Not an Appropriate Remedy .......................................................19

      B.  The Conditions of Plaintiffs' Confinement Do Not Constitute a "Punishment" Without Due Process of Law ......................................23

      C.  Plaintiffs Have Not Shown That This Is an "Extraordinary Case" Meriting Bail and Their Requested Relief Improperly Overrides Statutory Mandates..............................................................27

   II.  Plaintiffs' Claims of Irreparable Harm Do Not Outweigh the Serious Public Interests Imperiled by Plaintiffs' Release.....................................................32

   III. The District Court Erred In Granting Provisional Class Certification. .........38

i

A. Plaintiffs Failed to Establish Commonality ..........................................38

B. Plaintiffs Failed to Demonstrate Typicality .......................................42
.
C. Plaintiffs Failed to Establish Adequacy. ............................................44

CONCLUSION ..................................................................................................46

## TABLE OF AUTHORITIES

### CASES

*Adidas Am., Inc. v. Skechers USA, Inc.*,
  890 F.3d 747 (9th Cir. 2018) ..............................................................35

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ..........................................................................41

*Badea v. Cox*,
  931 F.2d 573 (9th Cir. 1991) ...................................................... 19, 22

*Bell v. Wolfish*,
  441 U.S. 535 (1979) .................................................................. *passim*

*Blackie's House of Beef, Inc. v. Castillo*,
  659 F.2d 1211 (D.C. Cir. 1981).........................................................33

*Bolante v. Keisler*,
  506 F.3d 618 (7th Cir. 2007) .................................................. 4, 30, 31

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ..........................................................................17

*Caribbean Marine Servs. Co. v. Baldrige*,
  844 F.2d 668 (9th Cir. 1988) .............................................................36

*Chin Wah v. Colwell*,
  187 F. 592 (9th Cir. 1911) ......................................................... 14, 21

*Cinquemani v. Ashcroft*,
  No. 00-CV-1460 (RJD), 2001 WL 939664 (E.D.N.Y. Aug. 16, 2001) ..............31

*Crawford v. Bell*,
  599 F.2d 890 (9th Cir. 1979) ..................................................... *passim*

*Dawson et al., v. Asher, et al.*
  2020 WL 1304557 (W.D. Wash. Mar. 19, 2020)............................................25

iii

*De Beers Consol. Mines v. U.S.*,
  325 U.S. 212 (1945) ........................................................................................21

*Demore v. Kim*,
  538 U.S. 510 (2003) ........................................................................................24

*East Tex. Motor Freight Sys., Inc. v. Rodriguez*,
  431 U.S. 395 (1977) ........................................................................................16

*Farmer v. Brennan*,
  511 U.S. 825 (1994) ........................................................................................27

*Fla. Entm't Mgmt., Inc.*,
  736 F.3d 1239 (9th Cir. 2013) ................................................................... 35, 36

*Francisco M. v. Decker*,
  No. CV 20-2176 (CCC), 2020 WL 1846674 (D.N.J. Mar. 25, 2020) ................28

*Gonzalez v. Barr*,
  955 F.3d 762 (9th Cir. 2020) ...........................................................................17

*Graham v. Decker*,
  2020 WL 1847568, at*8 (S.D.N.Y. April 13, 202 .............................................28

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ................................................................... 43, 44

*Helling v. McKinney*,
  509 U.S. 25 (1993) ..........................................................................................27

*Hendrickson*,
  576 U.S. 389, 135 S. Ct. 2466 (2015) .............................................................15

*Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) ...........................................................................40

*Hope v. Warden*,
  956 F.3d 156 (3d Cir. 2020) ...............................................................................5

iv

*Herb Reed Enters. LLC v. Fla. Entm't Mgmt., Inc.*,
    736 F.3d 1239 (9th Cir. 2013) ........................................................... 35, 36

*Padilla et al. v. ICE*,
    953 F.3d 1134 (9th Cir. 2020) ...............................................................30

*Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*,
    774 F.3d 935 (9th Cir. 2014) .................................................................17

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018)..................................................................... 24, 37

*Jones v. Blanas*,
    393 F.3d 918 (9th Cir. 2004) .................................................................23

*Kingsley v. Hendrickson*,
    576 U.S. 389 .......................................................................................15

*Kraft v. Gates*,
    905 F.2d 1540 (9th Cir. 1990) ...............................................................19

*Land v. Deeds*,
    878 F.2d 318 (9th Cir. 1989) .................................................................28

*Leigh v. Salazar*,
    677 F.3d 892 (9th Cir. 2012) .................................................................17

*Mapp v. Reno*,
    241 F.3d 221 (2d Cir. 2001) ..................................................... 21, 30, 31

*Marino v. Vasquez*,
    812 F.2d 499 (9th Cir. 1987) ..................................................... 21, 22, 41

*Nettles v. Grounds*,
    830 F.3d 922 (9th Cir. 2016) ....................................................... *passim*

*Paige v. State of Cal.*,
    102 F.3d 1035 (9th Cir. 1996) ..................................................... *passim*

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014) ................................................................ 40, 41, 43

*Pimentel v. Dreyfus*,
   670 F.3d 1096 (9th Cir. 2012) ...........................................................17

*Preiser v. Rodriguez*,
   411 U.S. 475 (1973) ..........................................................................2, 14

*Ramirez v. Galaza*,
   334 F.3d 850 (9th Cir. 2003) ..............................................................22

*Roe v. U.S. Dist. Ct. (In re Roe)*,
   257 F.3d 1077 (9th Cir. 2001) .........................................................3, 27

*Sali v. Corona Reg'l. Med. Ctr.*,
   909 F.3d 996 (9th Cir. 2018) ..............................................................18

*Swain v. Junior*,
   958 F.3d 1081 (11th Cir. 2020) ...........................................................34

*Turay v. Seling*,
   100 F. App'x 606 (9th Cir. 2004) ................................................. 19, 22

*United States v. Dade*,
   959 F.3d 1136 (9th Cir. 2020) ...................................................... 27, 29

*United States v. Martinez-Fuerte*,
   428 U.S. 543 (1976) ..........................................................................33

*United States v. McCandless*,
   841 F.3d 819 (9th Cir. 2016) ........................................................ 21, 27

*Valentine v. Collier*,
   956 F.3d 797 (5th Cir. 2020) ...............................................................34

*Valentino v. Carter-Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996) ...............................................................17

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ................................................................... *passim*

*Washington v. Trump*,
  847 F.3d 1151 (9th Cir. 2017) ..............................................................5

*Wilson, v, Williams*,
  961 F.3d 829 (6th Cir. 2020) ...............................................................34

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................... *passim*

*Yokoyama v. Midland Nat'l Life Ins. Co.*,
  594 F.3d 1087 (9th Cir. 2010) .............................................................18

*Zepada  Rivas v Jennings*,
  2020 WL 2059848 (N.D. Cal. Apr. 29, 2020).......................................1

*Zepeda Rivas et al., v. Jennings, et al.*,
  2020 WL 3055449 (N.D. Cal. Jun. 9, 2020) .........................................1

*Zinser v. Accufix Research Inst., Inc.*,
  253 F.3d 1180 (9th Cir. 2001) .............................................................17

## STATUTES

8 U.S.C. § 1182(d)(5)............................................................................39

8 U.S.C. § 1225(b) ......................................................................... 29, 39

8 U.S.C. § 1225(b)(2)................................................................. 13, 33, 34

8 U.S.C. § 1225(c) ...............................................................................29

8 U.S.C. § 1226(a) ..................................................................... 25, 30, 33, 34

8 U.S.C. § 1226(c) ....................................................................... *passim*

8 U.S.C. § 1226(e) ......................................................................... 30, 33

8 U.S.C. § 1231 ...................................................................................25

8 U.S.C. § 1231(a)(2) ................................................................ 29, 33, 34

8 U.S.C. § 1231(a)(6) ....................................................................... 31, 34

8 U.S.C. § 1252(f)(1) .........................................................................30

18 U.S.C. § 3143(b)(1)(A) ................................................................29

18 U.S.C. § 3626(a)(3)(B) ................................................................40

28 U.S.C. § 1292(a)(1) .......................................................................5

28 U.S.C. § 1331 .................................................................................4

28 U.S.C. § 1346 .................................................................................4

28 U.S.C. § 2241 ............................................................................4, 14

42 U.S.C. § 1983 ...............................................................................22

## RULES

Fed. R. App. P. 32(a)(5) ....................................................................47

Fed. R. App. P. 32(a)(7)(B) ..............................................................47

Fed. R. Civ. P. 23 ......................................................................... 11, 17

Fed. R. Civ. P. 23(a)(2) .....................................................................37

Fed. R. Civ. P. 23(b)(2) ............................................................... 37, 38

Fed. R. Civ. P.65(b) ............................................................................5

## REGULATIONS

8 C.F.R. § 236.1(C)(8) .......................................................................39

CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Jun. 22, 2020),

https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional
-detention.pdf ..................................................................................................... 7

ICE, *COVID-19 Pandemic Response Requirements* (Apr. 10, 2020),
https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFaciliti
es.pdf, .............................................................................................................. 7

CDC, *People Who are at Higher Risk for Severe Illness*,
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-
higher-risk.html .......................................................................................... 28, 38

## INTRODUCTION

COVID-19 has presented substantial and unprecedented challenges to the Nation. The federal government's response to those challenges at immigration-detention facilities across the country has been swift and thorough—including at the Mesa Verde Detention Facility and the Yuba County Jail (collectively, "the Facilities"), where Immigration and Customs Enforcement (ICE) has proactively mobilized to prevent, contain, and treat COVID-19. Despite these efforts, plaintiffs filed a habeas petition and accompanying motions for a temporary restraining order and class certification claiming that their detention at the Facilities violates due process based on their perceived risk of contracting COVID-19. The district court certified a class of all detainees at the Facilities and issued a TRO, __ F. Supp. 3d ___, 2020 WL 2059848 (N.D. Cal. Apr. 29, 2020) ("Order 1"), and later granted a preliminary injunction, __ F. Supp. 3d __, 2020 WL 3055449 (N.D. Cal. Jun. 9, 2020) ("Order 2"), that created a system to release detainees on bail, *see* Order 1 at 5; Order 2 at 1-2 (Excerpts of Record (ER) (76, 011-012). The district court has since released 124 detainees in 34 separate bail orders.

This Court should vacate the district court's TRO, preliminary-injunction order and bail orders because the orders rest on serious errors of law and inflict profound harms on the government and the public.

*First*, the district court erred in entering the TRO, preliminary-injunction order, and bail orders because plaintiffs are not likely to succeed on the merits. Plaintiffs' challenge fails at the outset because habeas is not the proper vehicle for

immigration detainees to attack their conditions of confinement. Habeas authorizes challenges to the fact or duration of confinement, not the conditions of confinement. *See Nettles v. Grounds*, 830 F.3d 922, 930-31 (9th Cir. 2016) (en banc). And even if plaintiffs had a valid constitutional claim, the "appropriate remedy. . . would be a judicially mandated change in conditions. . . not release from confinement." *Crawford v. Bell,* 599 F.2d 890, 891-92 (9th Cir. 1979). The district court's attempt to distinguish *Nettles* and *Preiser v. Rodriguez*, 411 U.S. 475, 489 (1973), by asserting that those decisions do not address the scope of habeas for federal prisoners, including federal immigration detainees, but rather concern the need to impose the correct set of statutory procedural safeguards on state prisoner claims, is flawed.

The district court further erred to the extent it concluded that plaintiffs are likely to succeed in establishing that their conditions of confinement constitute punishment without due process of law. Order 1 at 3 (ER 074). Due process requires that immigration detention be "reasonably related" to the government's legitimate interest in enforcing the immigration laws. *Bell v. Wolfish*, 441 U.S. 535, 538-39 (1979). Plaintiffs' detention satisfies that standard. Plaintiffs are in immigration detention because they have violated the immigration laws of the United States and are subject to detention under those laws—in some cases mandatory detention based on their criminal history—to ensure that they appear for their removal proceedings and do not abscond.

Plaintiffs likewise have failed to make the additional required showing that this is an "extraordinary case" justifying bail. This Court has held that a district

court "clearly err[s]" if it grants bail outside of an "extraordinary case" (and has not affirmed district courts as having the authority to order release on bail in a pending lawsuit even in an "extraordinary case"). *Roe v. U.S. Dist. Ct. (In re Roe)*, 257 F.3d 1077, 1080 (9th Cir. 2001). The district court's 30+ bail orders (none of which contains any reasoning or explanation), collectively releasing over a hundred detainees—including numerous convicted murderers and dangerous criminal aliens—render this Court's limitations on bail a nullity. The bail order also represent an improper judicial overwriting of Congress's statutory mandates regarding the detention of immigration detainees without adequate constitutional justification.

*Second,* considerations of harm and the equities cut decisively against injunctive relief. The district court's orders have already led to the release of numerous violent and dangerous criminals, some of whom are a clear flight risk. For example, the court has ordered the release of Mario Joya Lazo, who was convicted of first-degree murder and sentenced to life in prison, Dkt. 180-8, 194-8, 206, and Tith Ton, who was convicted of first-degree murder and five counts of attempted murder for killing a teenager and shooting at unarmed people at a playground, among other acts, while he was a gang member, Dkt. 297-15, 319-15, 335. If left in place, the district court's orders will allow the release of additional detainees, while also making it more difficult for the government to use the Facilities for detaining violent individuals who should not be released. And, more broadly, the orders inflict serious harm by undermining laws enacted by Congress and impairing the ability of the Executive Branch to execute those laws as it responds to an ongoing public health crisis. Plaintiffs, by contrast, have failed to show a comparable likelihood of harm

3

in the absence of injunctive relief. Indeed, when the court granted its preliminary injunction, plaintiffs had neither alleged nor presented evidence that COVID-19 had spread to any detainees at the Facilities.[1] Nor have they demonstrated that their claimed injury that they are at serious risk of becoming infected with COVID-19 due to the conditions at the Facilities is likely. The district court's weighing of the equities was additionally flawed because it failed to consider the substantial mitigating effect of ICE's efforts in combating COVID-19 at the Facilities. *See Bolante v. Keisler*, 506 F.3d 618, 620-21 (7th Cir. 2007).

*Third*, this Court should vacate the district court's order preliminarily certifying all detainees at the Facilities as a class. Plaintiffs' class consists of a diverse group of detainees whose criminal backgrounds and risk of suffering harm from COVID-19 vary dramatically. The district court recognized as much when it created a system of bail where release is predicated, in part, on an individual detainee's health vulnerability and criminal background. *See* Order 2 at 1-2 (ER 11-12). Because plaintiffs failed to demonstrate that all putative class members possess the same interest in release and are likely to suffer the same injury, the district court erred in certifying the class.

## STATEMENT OF JURISDICTION

Plaintiffs invoked jurisdiction under 28 U.S.C. §§ 1331, 1346, and 2241. Complaint at 5-6, Dkt 1. This Court has jurisdiction over the Government's appeal

---

[1] At the time of the preliminary injunction, there were no confirmed COVID-19 cases among any detainees at the Facilities. Since the preliminary injunction, one detainee has tested positive, and this detainee was discovered when he first arrived at Mesa Verde during intake and was medically isolated to prevent spread to other detainees.

of the district court's preliminary injunction under 28 U.S.C. § 1292(a)(1). Because the district court's TRO granted affirmative, status-quo-altering relief by establishing a system of bail for putative class members with the purpose of reducing the Facilities' population, this Court also has jurisdiction over the Government's appeal of the TRO under § 1292(a)(1). *See Hope v. Warden*, 956 F.3d 156, 160 (3d Cir. 2020) ("Where [] a purported TRO goes beyond preservation of the status quo and mandates affirmative relief, the order may be immediately appealable under § 1292(a)(1)."); *see also Washington v. Trump*, 847 F.3d 1151, 1158 (9th Cir. 2017) ("We may nonetheless review an order styled as a TRO if it possesses the qualities of a preliminary injunction," including that the order "was strongly challenged in adversarial proceedings before the district court and that it has or will remain in force for longer than the fourteen-day period identified in Federal Rule of Civil Procedure 65(b)." (internal quotations and citations omitted)).

For similar reasons, this Court has jurisdiction under 28 U.S.C. § 1292(a)(1) over the Government's appeal of the district court's orders granting bail during the pendency of plaintiffs' habeas petition: the orders flow directly from the TRO and preliminary injunction and therefore should be considered in conjunction with those orders, *see Washington*, 847 F.3d at 1158; combined with the TRO, the bail orders granted status-quo-altering relief; *see Hope*, 956 F.3d at 160; and the bail orders were strongly challenged in adversarial proceedings before the district court and remain in effect beyond the 14-day period identified in Fed. R. Civ. P. 65(b), *see Washington,* 847 F.3d at 1158.

This Court has jurisdiction over the Government's appeal of the district court's grant of class certification because it "is inextricably bound up with the grant of [an] interim injunction," *Paige v. State of Cal.*, 102 F.3d 1035, 1039 (9th Cir. 1996)—here, the TRO and subsequent preliminary injunction.

## STATEMENT OF ISSUES

1.    Whether, the district court erred in granting a TRO, preliminary injunction, and series of bail orders that (in combination) released more than a hundred detainees, where the Government is likely to succeed on the merits because:

    a. habeas is not the appropriate vehicle for plaintiffs' conditions of confinement claims and release is not the proper remedy;

    b. plaintiffs are not likely to succeed on their claim that their conditions of confinement constitute "punishment" without due process of law because their detention is rationally related to multiple legitimate government objectives; and

    c. plaintiffs have failed to make the additional required showing that this is an "extraordinary case" justifying release on bail given that class members have vastly different risk profile for COVID-19.

2.    Whether the district court erred in concluding that considerations of harm and the equities weigh in plaintiffs' favor, where the relief the district court ordered has resulted in the release of numerous dangerous individuals and undermined duly enacted laws by impairing the ability of the Executive Branch to carry out those laws as it responds to an unfolding public health crisis, and where plaintiffs' claims of irreparable harm are not immediate, do not account for the

6

substantial effects of ICE's mitigating efforts at the Facilities, and do not outweigh the serious public interests threatened by plaintiffs' release.

3. Whether the district court erred in certifying as a class a diverse group of detainees from two detention facilities, where class members have differing interests based on individualized risk factors and plaintiffs failed to demonstrate commonality, typicality, and adequacy.

## STATEMENT OF THE CASE

## I. Factual Background

Since the early days of the pandemic, ICE has taken extensive steps at both Mesa Verde and Yuba to reduce the risk of COVID-19. At both Facilities, ICE closely follows the Centers for Disease Control and Prevention (CDC) guidance on the management of COVID-19 in detention facilities and ICE's COVID-19 Pandemic Response Requirements (PRR). *See* CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Jun. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf (last visited July 23, 2020; archived from May 27, 2020) (CDC Guidance); ICE, *COVID-19 Pandemic Response Requirements* (Apr. 10, 2020), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf, (last visited July 22, 2020; archived from May 27, 2020); *see also* Pham Decl. ¶¶ 17–18 (ER 95) (describing ICE's compliance at the Facilities with CDC Guidance and the PRR); Fishburn Decl. ¶¶ 17–18 (ER 137) (same).

In conformance with this guidance, all newly arriving detainees at the Facilities are screened for COVID-19. Pham Decl. ¶ 21 (ER 96); Fishburn Decl. ¶ 20 (ER095). Detainees who present symptoms consistent with COVID-19 are placed in isolation, where they are tested for COVID-19 and influenza to rule out any other source of symptoms. Pham Decl. ¶ 23 (ER 97); Fishburn Decl. ¶ 22 (ER 096). Detainees who test positive are kept in isolation and treated. Pham Decl. ¶ 23 (ER X); Fishburn Decl. ¶ 22 (ER 096). At Mesa Verde, new detainees are offered COVID-19 testing that provides same-day results. Bonnar Decl. ¶ 8 (ER 081). At Yuba, all newly arriving detainees are placed in a 14-day quarantine, no matter their history. Fishburn Decl. ¶ 21 (ER 138).

Both Facilities provide education about COVID-19 to detainees and instruct detainees to seek immediate medical care if they feel ill. Pham Decl. ¶ 28-31 (ER 98); Fishburn Decl. ¶ 32 (ER 098). Medical staff at the Facilities examine any detainee who submits a medical request due to symptoms consistent with COVID-19. Pham Decl. ¶ 25 (ER X); Fishburn Decl. ¶ 23 (ER 096). Detainees who present symptoms consistent with COVID-19 are placed in isolation and tested for COVID-19. Pham Decl. ¶ 23 (ER 97); Fishburn Decl. ¶ 22 (ER 096).

The Facilities have also increased sanitation and hygiene efforts. Staff at both Facilities frequently clean and sanitize the Facilities, including common area high-contact surfaces. Pham Decl. ¶ 32 (ER 101); Fishburn Decl. ¶ 33 (ER 098). Both Facilities supply detainees with disinfectant, sanitizer, bar soap, and liquid soap, and encourage detainees to use them. Pham Decl. ¶¶ 33–37 (ER 101-03); Fishburn Decl. ¶ 34–36 (ER 151-52). Both Facilities additionally provide all detainees with masks

8

and require staff to wear masks any time they are within six feet of a detainee. Pham Decl. ¶¶ 65–67 (ER 118-19); Fishburn Decl. ¶¶ 56–57 (ER 158). Medical staff are required to wear N95 masks during all patient encounters at Mesa Verde, Pham Decl. ¶ 67 (ER 119), and during contact with newly arriving detainees at Yuba, Fishburn Decl. ¶¶ 21, 58 (ER 149, 158). ICE has also significantly reduced the population at the Facilities to enable greater distancing. Between March 11, 2020, when the World Health Organization declared a pandemic, and May 26, 2020, ICE reduced the detainee population at Mesa Verde from 355 to 168 (a reduction of about 53%) and reduced the detainee population at Yuba from 168 to 79 (a reduction of about 53%). Pham Decl. ¶ 10 (ER 94); Fishburn Decl. ¶ 8 (ER 147). As of May 26, Mesa Verde was at 42% of capacity and Yuba was at 47% of capacity. *Id*.

In addition to reducing the detainee population, both Facilities have taken numerous measures to increase social distancing among detainees. Pham Decl. ¶¶ 12–13 (ER 94); Fishburn Decl. ¶¶ 11–12 (ER 147). At Mesa Verde, these efforts include: reducing the occupancy of each housing unit to below 50% capacity, Fisburn Decl. ¶ 39 (ER 152); staggering sleeping arrangements so that no two adjacent beds are occupied, *id*. ¶ 41 (ER 152-53); sleeping one detainee to a bunk, alternating between top and bottom, *id*.; taping off and shutting down adjacent sinks, toilets, and showers, *id*. ¶¶ 44–47 (ER 155-56); and staggering meal times and ensuring six-feet of distance between detainees during meals, *id*. ¶¶ 55–58 (ER 158). At Yuba, these efforts include: reducing the occupancy of housing units to below 50% capacity, Pham Decl. ¶¶ 38–39 (ER 103); assigning detainees one to a cell in half of the Facilities' housing units, *id*. ¶ 41 (ER 103-04); removing bunks from

9

housing units, *id*. ¶ 46 (ER 107); prohibiting detainees from sharing bunks, *id*.; and providing meals to detainees in their respective housing units, where they are able to remain six feet apart (there is no communal dining hall at Yuba), *id*. ¶¶ 45, 49, 50 (ER 105-06, 110, 111).

Both Facilities have also suspended social visitation and encourage non-contact visits with attorneys by providing access via telephone. Pham Decl. ¶ 69 (ER 119); Fishburn Decl. ¶ 59 (ER X). Attorneys making in-person visits must wear appropriate personal protective equipment and submit to medical screening prior to entering the Facilities. *Id*.. Both Facilities screen all staff and vendors when they enter the Facilities for any symptoms, including by checking body temperature. Pham Decl. ¶ 70 (ER 119); Fishburn Decl. ¶ 60 (ER 159).

At the time of the district court's preliminary injunction, there were no confirmed or suspected cases of COVID-19 among any detainees or staff at either of the Facilities. Pham Decl. ¶ 14 (ER 94); Fishburn Decl. ¶ 13 (ER 147). At that time, medical staff at the Facilities had not encountered any detainee displaying symptoms consistent with COVID-19 at any point. Pham Decl. ¶ 15 (ER 94); Fishburn Decl. ¶ 14 (ER 147). Nor had any staff member reported having symptoms consistent with COVID-19 at any point. Pham Decl. ¶ 16 (ER 95); Fishburn Decl. ¶ 15 (ER 147).

## II. Procedural Background

On April 20, 2020, seven plaintiffs, on behalf of themselves and all detainees at Yuba and Mesa Verde, filed a petition for a writ of habeas corpus and a class complaint for injunctive and declaratory relief. *See* Complaint. Plaintiffs contended

that the conditions of their confinement at the Facilities exposed them to a "grave risk" of harm from exposure to COVID-19 in violation of due process. *Id*. at 11, 12. As relief, plaintiffs sought the "rapid, orderly, systematized decrease in the detainee populations" at the Facilities. *Id*. at 28. Plaintiffs asked the district court to direct ICE to implement social distancing, including by "releasing sufficient class members to make social distancing possible and halting the introduction of any new detainee absent truly exigent justification." *Id*. at 2.

Plaintiffs moved for a TRO and sought to provisionally certify a class. Order 1 (ER 72-78); Plaintiff's First Motion to Certify a Class ("Pls. Class Cert. Mot."), Dkt. 6. On April 29, the district court certified the class and granted a TRO. Order 1 (ER 72. In its order, the district court concluded that plaintiffs had demonstrated sufficient commonality, typicality, and adequacy under Fed. R. Civ. P. 23 for their proposed class, and reasoned that "the primary question" was whether plaintiffs were being exposed to an unreasonable risk of infection in violation of due process. Order 1 at 2-3 (ER 73-74). The district court further concluded that exposure to COVID-19 is a "significant danger" to "everyone," not merely those in high-risk groups. *Id*. at 2 (ER 73). The court ruled that plaintiffs had shown a strong likelihood that they would prevail on their claim that their conditions of confinement violate their due-process rights by exposing them to a significant risk of exposure to COVID-19. *Id*. The court also determined that plaintiffs had shown irreparable harm due to a perceived lack of COVID-19 testing at the Facilities and the alleged regular influx of detainees from outside facilities with cases of COVID-19. *Id*. at 4 (ER 75). The court concluded that the public interest and balance of equities favored preliminary

11

relief because the conditions of confinement at the Facilities threatened facility staff and the greater community.  *Id*. at 4-5 (ER 75-76).

The TRO did not direct the release of any provisional class members.  *See generally*, Order 1 (ER 72-76).  Instead, the district court ordered ICE to provide, by May 1, the names, ages, health vulnerabilities, and criminal information for detainees at the Facilities so that the court could develop "a system for considering individual bail applications."  *Id*.at 5 (ER 76).  The court said that detainees would be released upon a showing of "extraordinary circumstances justifying release," based upon four factors: (i) the likelihood that the class will ultimately prevail on the habeas petition; (ii) the risk posed to the detainee by current conditions at the Facilities; (iii) the likelihood that the detainee will not be a danger if released; and (iv) the likelihood that the detainee will appear for later immigration proceedings. Standards of Considering Bail Requests ("Bail Standards"), Dkt. 90 (ER 71); *see also* Order 2 at 1-2 (ER 11-12) (reiterating standards).

Between May 1 and June 10 (the date the government filed its notice of appeal), the district court issued 29 bail orders, 27 of which ordered the release of a total of 115 detainees.  *See* Bails Orders, Dkts. 95, 97, 106, 107, 115, 132, 145, 159, 173, 177, 183, 204, 206, 213, 218, 238, 242, 246, 250, 268, 271, 272, 281, 295, 303, 320, 335, 342, 360, 364, 367, 375.[2] (ER 9-69).  Nearly half of the detainees ordered released on bail were held under the mandatory-detention authorities in 8 U.S.C.

---

[2] The district court continues to issue bail orders after this appeal was filed, including a new one just today. *See* Bail Orders, Dkt. 401, 415, 425, 448, 459 (ordering ten additional detainees released) (ER 4-7).

§§ 1226(c) and 1231(a)(2), while the rest were detained under 8 U.S.C. §§ 1225(b)(2), 1226(a), and 1231(a)(6) (which provide ICE with discretion over whether to detain). *See generally* Federal Defendants' Responses to Bail Applications, Dkts. 103, 104, 111, 127, 136, 139, 151, 165, 169, 170, 178, 193, 194, 201, 210, 211, 221, 223, 232, 254, 255, 256, 257, 265, 275, 280, 294, 296, 307, 308, 319, 330, 341, 348, 349, 350, 352. The court's bail orders do not contain any reasoning or explanation—they merely list detainees under categories of "bail granted," "bail denied," or bail "motion deferred." *See generally* Bail Orders. The court has revoked the bail of one detainee (who has a warrant for his arrest in Guatemala for murder) who cut his ankle bracelet and absconded, but that detainee remains at large. Bail Order, Dkt. 367.

On June 9, the district court granted a preliminary injunction. *See* Order 2 (ER 11-22). The district court noted that it believed that conditions at the Facilities had significantly improved, stating that "it appears possible that the conditions at the facilities have reached, or at least are approaching, the constitutional minimum given the health threat—at least for detainees who pose a significant danger to the community or otherwise should not be released." *Id.* at 8 (ER 18). The court ordered ICE to "maintain the status quo of safety that currently exists at the facilities." *Id.* The court observed that "as a practical matter, this may mean that ICE cannot increase the net number of detainees more than minimally." *Id.* To maintain the "status quo," the district court ordered that prior orders releasing detainees on bail would remain in effect and stated that it would continue to consider bail applications submitted by class counsel. *Id.* at 9 (ER 19).

13

In granting the preliminary injunction, the district court rejected the Government's argument that under this Court's decision in *Nettles*, conditions-of-confinement claims cannot be brought in habeas. Order 2 at 10 (ER 20). The district court distinguished both *Nettles* and *Preiser v. Rodriguez*, 411 U.S. 475, 489 (1973), in which the Supreme Court ruled that habeas relief was proper because the petitioners challenged the "fact or duration" of their confinement, on the ground that those cases did not involve federal detainees raising habeas claims under 28 U.S.C. § 2241. *Id*. at 10-11 (ER 20-21). The court also rejected the government's reliance on *Chin Wah v. Colwell*, 187 F. 592, 594 (9th Cir. 1911), in which this Court held that a district court lacked authority to grant bail in deportation cases because no statute granted the court such authority, on the ground that that case interpreted an obsolete statute and did not address whether a district court can order the temporary release of detainees held in unlawful conditions. Order 2 at 10 (ER 20). Lastly, the district court concluded that, regardless of whether habeas was available to plaintiffs, it had the inherent authority to release plaintiffs on bail as a form of equitable relief based on plaintiffs' claim that their conditions of confinement imposed an unreasonable risk of contracting COVID-19 due to the conditions at the Facilities *Id*. at 10-12 (ER 20-22); *see also* Order 1 at 1 (ER 72).

## SUMMARY OF ARGUMENT

This Court should reverse the district court's orders.

I. The district court erred in granting injunctive relief because plaintiffs are not likely to succeed on the merits.

A.  Plaintiffs' suit was flawed from its inception because plaintiffs brought their challenge through a petition for a writ of habeas corpus. This Court has held that conditions-of-confinement challenges are not cognizable in habeas. *See Nettles*, 830 F.3d at 930-31.  Instead, habeas may be used to challenge only the fact or duration of confinement.  And regardless of the basis for plaintiffs' claims, release is not an available remedy for a conditions-of-confinement challenge. *See Crawford,* 599 F.2d at 891-92.  Thus, the district court was wrong to grant relief.

B.  On the merits, plaintiffs have failed to demonstrate a likelihood of success on their claims.  Plaintiffs argued below that their detention violates due process because it is tantamount to "punishment." *Bell*, 441 U.S. at 535.  That argument fails because plaintiffs' detention reasonably furthers legitimate government interests and is not "excessive in relation to that purpose." *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466, 2473-74 (2015).  Plaintiffs' detention furthers the government's interests in enforcing immigration laws, in protecting the public, and in ensuring that plaintiffs appear for removal proceedings.

C.  The district court erred in ordering bail for the further reason that plaintiffs have failed to show that this is an "extraordinary case" justifying bail.  The district court's bail orders also override statutory mandates without justification.

15

II. Considerations of harm and the equities weigh strongly against the district court's injunctive relief. The district court's orders inflict significant harm on the public by preventing ICE from enforcing immigration detention laws and by requiring the release of a substantial number of detainees into the community who are otherwise properly subject to detention, including many detainees with serious criminal histories. Plaintiffs, by contrast, will not suffer comparable harm in the absence of injunctive relief, particularly given the extensive measures ICE has taken at the Facilities to protect detainees against the risks associated with COVID-19.

III. The district court erred when it provisionally certified a diverse class of all detainees at two different Facilities. The risk that COVID-19 poses to each class member depends on myriad factors such as age and underlying health conditions. Likewise, the question whether to release a particular detainee under the district court's bail system depends on the detainee's particular health vulnerabilities, criminal history, and likelihood of appearing at later immigration proceedings. Named plaintiffs and class members therefore neither "possess the same interest" nor "suffer the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (quoting *East Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)). Plaintiffs accordingly failed to demonstrate that the putative class satisfies Rule 23's requirements of commonality, typicality, and adequacy. *See id.* at 350. That the district court's system of bail orders differentiates class members based on their unique characteristics—and encourages ICE to prioritize relief of some class members over others—confirms that class certification was inappropriate.

16

## STANDARD OF REVIEW

This Court reviews the grant of a preliminary injunction for abuse of discretion. *Gonzalez v. Barr*, 955 F.3d 762, 768 (9th Cir. 2020) (internal citation omitted). In evaluating whether a preliminary injunction was properly issued, this Court reviews the district court's legal conclusions de novo. *Leigh v. Salazar*, 677 F.3d 892, 896 (9th Cir. 2012). The district court's factual findings are generally reviewed for clear error, *see Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012), but "factual findings predicated on a misunderstanding of the governing rules of law" cannot be affirmed under the clear-error standard, *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 944 (9th Cir. 2014).

"A preliminary injunction is an extraordinary remedy never awarded as a matter of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To prevail, a movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart*, 564 U.S. at 348 (quoting *Califano v. Yamasaki,* 442 U.S. 682, 700-701 (1979)). "Before certifying a class, the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001) (quoting *Valentino v. Carter-Wallace, Inc.*,

97 F.3d 1227, 1233 (9th Cir. 1996)). This Circuit "first review[s] a class certification determination for legal error under a de novo standard." *Sali v. Corona Reg'l. Med. Ctr.*, 909 F.3d 996, 1002 (9th Cir. 2018). Only after this Court is satisfied that "no legal error occurred. . . will [it] proceed to review the. . . decision for abuse of discretion." *Id.* (quoting *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1091 (9th Cir. 2010)).

## ARGUMENT

This Court should vacate the district court's orders granting plaintiffs relief. The TRO, preliminary injunction, and bail orders rest on serious errors of law and profoundly undermine the public interest. The district court's grant of class certification likewise rests on manifest errors of law and should be vacated.

## I. The Government is Likely to Succeed on The Merits.

In granting the TRO, preliminary injunction, and release on bail, the district court committed a number of legal errors requiring vacatur.

### A. Habeas Corpus is Not a Proper Vehicle for Plaintiffs to Challenge Their Conditions of Confinement and Release is Not an Appropriate Remedy

The district court erred in concluding that habeas, through a class-wide bail process, is an appropriate vehicle for immigration detainees to challenge their conditions of confinement and that release is an appropriate remedy. *See* Order 1 at 5 (ER 76), Order 2 at 1-2 (ER 11-12). Plaintiffs' challenge therefore fails—and the orders at issue must be reversed—on that threshold ground.

1. To start, habeas is not the proper vehicle to challenge conditions of confinement. Habeas is available only to detainees challenging the *lawfulness* or *duration* of their detention. *See Nettles v. Grounds*, 830 F.3d 922, 930-31 (9th Cir. 2016) (en banc) (holding that state prisoners could not bring a habeas challenge to their conditions of confinement because conditions-of-confinement claims are not "core" habeas claims); *Crawford v. Bell,* 599 F.2d 890, 891 (9th Cir. 1979) ("the writ of habeas corpus is limited to attacks upon the legality or duration of confinement"). This Court has "long held that prisoners may not challenge mere conditions of confinement in habeas corpus." *Nettles*, 830 F.3d at 930-31; *see also, e.g.*, *Kraft v. Gates*, 905 F.2d 1540, 1990 (9th Cir. 1990) (table opinion) ("[T]he majority of Kraft's allegations. . . challenged the conditions of confinement and thus were improperly brought in a petition for habeas corpus."). That is so whether the detainee is held by state or federal authorities and whether the detention is criminal or civil. *See Nettles*, 830 F.3d at 930-31 (state prisoners); *Badea v. Cox*, 931 F.2d 573, 574 (9th Cir. 1991) (federal prisoners); *Turay v. Seling*, 100 F. App'x 606, 608 (9th Cir. 2004) (same).

Plaintiffs do not argue that ICE lacks a legal justification for keeping them in custody. *See generally* Complaint. Instead, they challenge the conditions of confinement at the Facilities. As the basis for their requested habeas relief, plaintiffs allege, for example, that "the conditions at [Yuba] and Mesa Verde endanger the lives of all who are detained there," *id*. at 13; that "incubation conditions" are ideal at the Facilities because of the way detainees are required to "live, sleep and eat in close quarters," *id*. at 17; and that required security measures render social distancing

"impossible," *id.* Such allegations are not cognizable through a habeas petition. *See Nettles*, 830 F.3d at 930-31.

2. Regardless of the nature of plaintiffs' claim, any remedy designed to effectuate release, including bail, would be improper for a conditions-of-confinement claim. *See* Order 1 at 2 (ER 73) ([T]his lawsuit is not about whether any particular person should be released; it is about the conditions of confinement at the facilities."). When a petitioner successfully challenges the conditions of his confinement, he is entitled to "a judicially mandated change in conditions and/or an award of damages, but not release from confinement." *Crawford*, 599 F.2d at 892. Yet the core relief that plaintiffs seek through habeas is release from detention. Complaint at 33 (requesting that the court, "[i]n gross or individually, order Defendants to release enough class members sufficient for the continued detention of any remaining class members not to violate their constitutional rights"); *see also id.* at 1 (requesting that ICE "implement social distancing at YCJ and Mesa Verde, *including releasing sufficient class members* to make social distancing possible and halting the introduction of any new detainee absent a truly exigent justification") (emphasis added); *id.* at 3 ("[S]hort of effectuating a significant enough reduction in population levels at [Yuba] and Mesa Verde, any remedial measures such as improved sanitation or hygiene will not be sufficient to head off risks posed by the spread of COVID-19."). And by creating a system of bail that, within weeks, effectuated plaintiffs' demands, the district court afforded plaintiffs the release they requested. The district court had no legal justification for doing so. *See Crawford*, 599 F.2d at 891-92. In sum, in this Circuit, a detainee cannot advance a conditions-

of-confinement challenge in a habeas petition, nor can he seek release as a remedy for a conditions-of-confinement challenge. Those reasons alone require that the district court's TRO, preliminary injunction, and bail orders be vacated.

3. Even if plaintiffs' claims were cognizable in habeas, plaintiffs would not be entitled to bail. For one thing, it remains an open question in this Circuit whether habeas plaintiffs are *ever* entitled to bail pending the final disposition of their claims, *see United States v. McCandless*, 841 F.3d 819, 822 (9th Cir. 2016), and this Court long ago suggested that district courts lack "inherent power to admit [detainees] to bail in deportation cases," *Chin Wah v. Colwell*, 187 F. 592, 594 (9th Cir. 1911); *accord Mapp v. Reno*, 241 F.3d 221, 225 (2d Cir. 2001) ("[*Chin Wah*] support[s] the view that there is no such inherent power in the federal courts and that they cannot admit a person to bail unless such power is expressly conferred by statute[.]"). But even if habeas bail were available in some circumstances, it would not be available here because a court's authority to issue interim relief extends no further than its authority to issue *ultimate* relief. *See De Beers Consol. Mines v. U.S.*, 325 U.S. 212, 220 (1945) (vacating preliminary injunction that did not seek "relief of the same character as that which may be granted finally"); *see also Marino v. Vasquez*, 812 F.2d 499, 507 (9th Cir. 1987) (stating that any power to issue bail in habeas "derives from the power to issue the writ itself"). No individual class member can establish that his own release would necessarily result from success on the class claims, because release is not an appropriate remedy for a conditions-of-confinement claim, and because even if the government were to release *some* detainees to further reduce the population at either Facility, it has no obligation to

21

release any *particular* detainee. *See* Order 2 at 1-2 (ER 72-73) (authorizing release of a detainee based upon a four-factor balancing test without mandating the release of any particular detainee). Because no detainee is entitled to release if the claims in this case succeed, the district court lacks authority to grant interim habeas relief in the form of release on bail.

4. The district court attempted to distinguish *Nettles* and *Preiser* by asserting that those decisions do not address the scope of habeas for federal prisoners, including federal immigration detainees, but rather concern the need to impose the correct set of statutory procedural safeguards on state prisoner claims. *See* Order 2 at 10-11 (ER 20-21). *Nettles* did address state-prisoner claims under 42 U.S.C. § 1983, but in reaching its decision, this Court relied on the rule that "prisoners may not challenge mere conditions of confinement in habeas corpus." 830 F.3d at 933 (citing *Crawford*, 599 F.2d at 891-92); *see also Ramirez v. Galaza*, 334 F.3d 850, 859 (9th Cir. 2003) (habeas relief is improper where correcting the allegedly unlawful conditions will not necessarily shorten prisoner's sentence). And this Court had previously rejected the use of habeas for conditions of confinement claims brought by both federal prisoners, *Badea v. Cox*, 931 F.2d 573, 574 (9th Cir. 1991) ("a civil rights action . . . is the proper method" for a federal prisoner to "challeng[e] conditions of confinement"), and civil detainees, *Turay* v. *Seling*, 100 F. App'x 606, 608 (9th Cir. 2004) (civil detainee's "Eighth Amendment and due process challenges must fail when brought as habeas grounds," because detainee's "remedy for the allegedly unconstitutional conditions of his confinement is [Section] 1983, not total

22

release from custody"). Accordingly, this Court's precedent forecloses the district court's attempt to distinguish *Nettles*.

This lawsuit does not assert a proper habeas claim—and thus it did not vest any inherent authority in the district court to order release on bail that might otherwise attach in a proper habeas lawsuit (to the extent such inherent authority is available in the first instance). *Cf. Marino*, 812 F.2d at 507.

## B. The Conditions of Plaintiffs' Confinement Do Not Constitute a "Punishment" Without Due Process of Law

The district court also concluded that plaintiffs had demonstrated an "exceedingly strong likelihood" that they will ultimately show that their conditions of confinement constitute an unconstitutional punishment. Order 1 at 3 (ER 74). This is wrong.

To begin, the district court failed to account for ICE's extensive efforts to address COVID-19 at the Facilities and the important governmental interests in reasonably enforcing immigration laws and in immigration detention. Conditions imposed on detainees that are "reasonably related to a legitimate Governmental objective. . . without more, [do not] amount to 'punishment'" In violation of due process. *Bell v. Wolfish*, 441 U.S. 535, 539 (1979); *see also id*. at 538 (unconstitutional punishment hinges on "whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose"). "[A] restriction is punitive where it is intended to punish, or where it is excessive in relation to its non-punitive purpose." *Jones v. Blanas*, 393 F.3d 918, 933-34 (9th Cir. 2004) (internal quotation omitted).

23

Despite ICE's extensive efforts to combat COVID-19 at the Facilities, *see* Factual Background, *supra* at pp. 7-10, and despite the Government's strong interest in enforcing the immigration laws, the district court credited plaintiffs' claim that their conditions of confinement constituted punishment. Order 1 at 3 (ER 74). After nothing more than a reference to the "tinderbox" risk of COVID-19 spreading in detention facilities, *id.*, and the conclusory statement that the virus presented (a seemingly equal) risk to both high-risk and healthier people, the district court baldly concluded that "ICE has failed to take sufficient action to address the obvious risks to detainees." *Id.* at 3-4 (ER 74-75). In so doing, the district court failed to apply the correct standard, under which it should have identified the Government's interests and evaluated whether the Government's conduct was reasonably related to achieving those interests. *See Bell*, 441 U.S. at 538-39.

Because it is reasonably related to a legitimate governmental objective, plaintiffs' detention does not constitute punishment. *See Bell*, 441 U.S. at 539. Preventing detained aliens from absconding and ensuring that they appear for removal proceedings—and ultimately, removal—as well as protecting the community from dangerous criminal aliens, are all legitimate governmental objectives. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018). Indeed, "deportation proceedings 'would be vain if those accused could not be held in custody pending the inquiry into their true character.'" *Demore v. Kim*, 538 U.S. 510, 523 (2003) (quoting *Wong Wing v. United States*, 163 U.S. 228, 235 (1896)). By virtue of his statutory authority, the Secretary of Homeland Security vested ICE with the authority to administer a system of detention for immigration detainees to

24

further the Government's legitimate objectives. Here, in maintaining custody of plaintiffs, the government advances the legitimate interest of protecting the public and ensuring that the Nation's immigration laws are properly enforced. *See Demore*, 538 U.S. at 523. Class members are in immigration detention because they violated federal immigration laws and are subject to detention under those laws—in some cases mandatory detention based on their criminal history or other features. *See* 8 U.S.C. §§ 1226(a), 1226(c), 1231.

The risks associated with COVID-19 do not change this legitimate and important interest, which justifies plaintiffs' continued detention at the Facilities. *See Dawson v. Asher*, No. C20-0409JLR-MAT, 2020 WL 1304557, at *2 (W.D. Wash. Mar. 19, 2020) ("Plaintiffs do not cite to authority, and the court is aware of none, under which the fact of detention itself becomes an 'excessive' condition solely due to the risk of a communicable disease outbreak—even one as serious as COVID-19."). The district court did not find otherwise. Quite the contrary, the district court recognized in the context of establishing a system of bail that the Executive has an interest in detaining aliens subject to removal proceedings or who pose a danger to the community or a flight risk. *See* Order 2 at 7 (ER 17); *see also* Order 1 at 5 (ER 76). Execution of those priorities is vested in ICE as part of the Executive Branch, and the district court may not supersede ICE's congressionally-mandated functions in the manner it has here absent the required showing that plaintiffs' detention is not related to the legitimate government objectives discussed above. The extensive steps ICE has taken to combat COVID-19 at the Facilities confirms that ICE's conduct was reasonably related to achieving the Government's

legitimate purposes of enforcing the immigration laws. *See generally,* Factual Background, *supra* at pp. 7-10.

Not only does plaintiffs' detention serve a "legitimate governmental purpose," it is also not "excessive"—that is to say, it is reasonably related to fulfilling ICE's legitimate purpose of enforcing immigration law. *Bell*, 441 U.S. at 538. As the Supreme Court has emphasized, "[t]he wide range of 'judgment calls' that meet constitutional and statutory requirements [for federal detention] are confided to officials outside of the Judicial Branch of Government." *Id.* at 562. The Constitution thus leaves the Government latitude in determining the means by which it may achieve its legitimate interest in executing the immigration laws. In evaluating those determinations, courts must be careful to impose only what the Constitution requires—not "a court's idea of how best to operate a detention facility." *Id.* at 539. The record presented to the district court demonstrates that plaintiffs fell well short of demonstrating that the Government's confinement of detainees at the Facilities was so excessive that it evinced "an expressed intent to punish on the part of detention facility officials." *Id.* at 538. And nothing in the district court's analysis shows otherwise.

In its preliminary-injunction order, the district court ruled plaintiffs were likely to succeed on their claim challenging the constitutionality of the conditions of confinement even while acknowledging the possibility that "conditions at the facilities have reached, or at least are approaching, the constitutional minimum given the health threat." Order 2 at 8 (ER 18); *see also id*. ("Given the improvements that have been achieved since the TRO was entered," ICE is ordered to "maintain the

status quo of safety that current exists at the facilities."). But, in the related context of an Eighth Amendment conditions-of-confinement suit, the Supreme Court has made clear that a plaintiff is likely to succeed only if he can show both that the "'attitudes and conduct'" were subjectively wanton "at the time suit [wa]s brought," and that the government is *currently* "knowingly and unreasonably disregarding an objectively intolerable risk of harm" and "will continue to do so . . . into the future" absent relief. *Farmer v. Brennan*, 511 U.S. 825, 845-846 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)). Particularly in light of the district court's determination that conditions at the Facilities have reached, or are approaching, constitutional muster, the district court was not justified in finding a likelihood of success on the merits.

For these reasons, plaintiffs cannot succeed on their claim that their confinement constitutes an unconstitutional punishment.

### C. Plaintiffs Have Not Shown That This Is an "Extraordinary Case" Meriting Bail, and Their Requested Relief Improperly Overrides Statutory Mandates

This Court has never affirmatively held that district courts have the authority to order release on bail in a pending civil lawsuit. *McCandless*, 841 F.3d at 822; *Roe*, 257 F.3d at 1080. And this Court has held that a district court "clearly err[s]" if it orders release on bail outside of an "extraordinary case involving special circumstances [and] a high probability of success." *Roe*, 257 F.3d at 1080; *see also United States v. Dade*, 959 F.3d 1136, 1138 (9th Cir. 2020).[3] Plaintiffs have not

---

[3] *Dade* makes clear that both "special circumstances" *and* a "high probability of success" are required to justify release on bail. 959 F.3d at 1158.

27

made either of these showings. The district court thus erred in ordering bail. *See supra* at p. 12-13 (citing bail orders).

To start, for the reasons discussed above, plaintiffs fall far short of demonstrating a "high probability of success" on the claim that their conditions of confinement at the Facilities amount to punishment in violation of due process. *See* Order 1 at 3-4 (ER 74-75); *Land v. Deeds*, 878 F.2d 318 (9th Cir. 1989); Part I-B, *supra*.

Plaintiffs also have not established that COVID-19 is an "extraordinary circumstance" justifying class-wide bail. *See* Order 1 at 5 (ER 76) ("In extraordinary cases like this, federal judges have the authority to release detainees on bail while their habeas cases are pending."); *see also* Order 2 at 1-2 (ER 11-12) (premising release upon a showing of "extraordinary circumstances" based upon, among other things, a particular detainee's health vulnerabilities and criminal background). Class members have vastly different risk profiles for COVID-19 based on age, preexisting conditions, and a host of other factors. *See* CDC, *People Who are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last accessed July 21, 2020). The district court recognized as much when it made the particular "risk posed to the detainee by current conditions at the facilities" one of four factors relevant to bail determinations. *See* Order 2 at 1-2 (ER 11-12). Courts have denied bail in other cases to individuals who could not demonstrate that they "personally face[] a heightened risk of complications" from COVID-19. *Graham v. Decker*, __ F. Supp. 3d , __ 2020 WL 1847568, at *8 (S.D.N.Y. April 13, 2020); *see also Francisco M.*

*v. Decker*, No. CV 20-2176 (CCC), 2020 WL 1846674, at *2 (D.N.J. Mar. 25, 2020) (denying bail pending habeas adjudication for petitioner whose fear of contracting COVID-19 was speculative and who did not have high-risk medical conditions). To conclude, as the district court did here, that COVID-19 is an extraordinary circumstance across the board for all detainees eviscerates the extraordinary-circumstance requirement. *See* Order 1 at 5 (ER 76).

In this regard, the district court was mistaken to rely on *Dade*, 959 F.3d 1136 (9th Cir. 2020), for the conclusion that COVID-19, in itself, is an extraordinary circumstance. Order 2 at 12 (ER 22). Contrary to the district court's suggestion, *id*., the majority opinion in *Dade* did not state that COVID-19 is an extraordinary circumstance in and of itself. Rather, the *Dade* majority suggested that "special circumstances" were present in that case given "the COVID-19 pandemic and the risks to [the petitioner] if he contracts it in prison." *Dade*, 959 F.3d at 1139. The *Dade* majority further stated that "we do not have that issue [whether 'special circumstances' are present] before us in this motion," *id*., and instead considered only whether Dade "will be a danger to the community if released, as that is what counts under [18 U.S.C.] § 3143(b)(1)(A)." *Id*. Plaintiffs here have not established that they all share particular vulnerabilities to COVID-19, nor have they established that all putative class members do, either.

Lastly, the preliminary relief ordered here in the form of bail proceedings is unlawful because the bail proceedings override statutory mandates without constitutional justification. Congress has provided that certain aliens are subject to mandatory detention. *See* 8 U.S.C. §§ 1225(b), 1226(c), 1231(a)(2). Congress has

further provided that ICE has discretion to decide whether and when other aliens should be detained (or released) pending a decision on their removal. *Id.* § 1226(a). And Congress has directed that "[n]o court may set aside any action or decision by the Attorney General under [these provisions] regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole." *Id.* § 1226(e). A district court may never override a statutory mandate unless the Constitution requires it. In this case, even if the conditions of plaintiffs' detention are deemed unconstitutional, at most that would justify mandating a change in those conditions. *See supra* at pp. 20-21. It would not justify overriding the detention statutes by ordering plaintiffs' release.[4] *See Bolante*, 506 F.3d at 620–21 (holding that release on bail while a lawsuit remains pending is a common-law power, not a constitutional one, and that where immigration statutes provide for detention, a court cannot order release on bail, because "[e]ven if in the absence of legislation a federal court could grant bail to an alien challenging a removal order, it cannot do so if Congress has forbidden it").

---

[4] By prohibiting ICE from "increas[ing] the net number of detainees more than minimally," Order 2 at 8 (ER X), the preliminary injunction runs afoul of 8 U.S.C. § 1252(f)(1) because the injunction improperly curtails ICE's lawful operations under the INA to detain *non-class aliens*. Although this Court has held that § 1252(f)(1) does not restrict injunctive relief on a class-wide basis where each member of the class "is in removal proceedings and facing an immediate violation of their rights," *Padilla v. ICE*, 953 F.3d 1134, 1151 (9th Cir. 2020), the injunction here extends beyond class members to reach aliens who have not yet been detained (and who thus by definition are not class members). The government's period for seeking rehearing or certiorari in *Padilla* has not yet expired.

The district court relied on *Mapp*, 241 F.3d 221, for the proposition that courts have inherent authority to release detainees on bail. *See* Order 1 at 5 n.17 (ER 17). But *Mapp* expressly held that where the government has decided to hold an immigration detainee under its statutory authority under the INA, courts cannot override the congressional statute to order the detainee released on bail. *See id.* at 229 n.12 ("had the [government] exercised its discretion under § 1231(a)(6) and decided not to release Mapp on bail, *we would be required to defer to its decision*") (emphasis added). The detainee in *Mapp* was potentially eligible for court-ordered bail only because no statutory detention provision applied to him. The government originally detained him under criminal-detention authority of 8 U.S.C. § 1226(c), but later determined that § 1226(c) did not apply. *Id.* at 228. The government could have detained him under § 1231(a)(6), but it never actually did so. *Id.* at 229 n.12. As a result, in that case, no statutory detention provision applied, leaving the court free to consider whether it could order bail in the absence of any statutory countermand. *Id.* But where a statutory detention provision applies, a court may not supersede the statute and order a detainee released on bail. *See Cinquemani v. Ashcroft*, No. 00-CV-1460 (RJD), 2001 WL 939664, at *7–8 (E.D.N.Y. Aug. 16, 2001) (denying bail because "[u]nlike *Mapp*, in the instant matter, the Attorney General *has* exercised its discretion and has determined to keep Cinquemani in custody," and thus "this Court would be required to defer to [the Attorney General's] decision") (emphasis in original)); *accord Bolante*, 506 F.3d at 620–21. That is precisely the case here.

31

## II. Plaintiffs' Claims of Irreparable Harm Do Not Outweigh the Serious Public Interests Imperiled by Plaintiffs' Release

Even if the district court had not committed the legal errors discussed above, equitable considerations fatally undermine the award of preliminary relief and require vacatur of the TRO, preliminary injunction, and bail orders. The district court's establishment of a class-wide bail system and its subsequent issuance of bail orders should also be vacated because the relief granted irreparably harms the United States and the public and is not justified by the alleged harms to plaintiffs from continued detention.

To begin, the United States faces the significant threat that released detainees will abscond. One such detainee in this case—released on bail despite an outstanding INTERPOL Blue Notice and warrant for arrest for murder in Guatemala—removed his electronic monitoring device, absconded, and remains at large. *See* Bail Order, Dkt. 367. Released detainees may also imperil public safety. Named plaintiff Javiar Alfaro, for example, has been convicted of felony assault on a spouse/cohabitant. Pham Decl. ¶ 5 (ER 194). Class member Jose Carmen Gomez was released despite his gang history and convictions for vandalism and second-degree murder with gang and firearms enhancements. Dkts. 266-8, 267-8, 289-4. Released class member Aaron Ramirez Avila was convicted of importing 15 pounds of methamphetamine and almost 40 pounds of cocaine into the United States. Dkts. 273-1, 294-1, 300-1, 303. Released class member Ricardo Cruz Calmo has a serious

history of DUI, including a DUI conviction that arose from leading a police officer on a chase in which the officer had to disable Mr. Cruz Calmo's vehicle by hitting it with his patrol vehicle. Dkts. 288-3, 208-3, 312-1, 348-3, 327-6, 375.

The TRO, preliminary injunction, and bail orders also damage the public interest because they supplant the congressionally designed scheme for immigration detention with an ad hoc bail system that has released a significant number of detainees who would otherwise have been subject to immigration detention under federal statute. *See* 8 U.S.C. §§ 1225(b)(2), 1226(a), 1226(c), 1231(a)(2), 1231(a)(6). By doing so, the district court's orders harm the public interest by undermining laws enacted by Congress and by impairing the ability of the Executive Branch to execute such laws as it responds to the current public health crisis. It is well settled that the public interest in enforcement of the United States' immigration laws is significant. *See, e.g.*, *United States v. Martinez-Fuerte*, 428 U.S. 543, 556–58 (1976); *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981). Congress has authorized—and in some cases mandated—detention for various categories of criminal aliens. *See*, *e.g*., 8 U.S.C. § 1226(c) (requiring detention of criminal aliens convicted of, *inter alia*, crimes of moral turpitude, controlled substances offenses, and terrorism offenses). Notably, in issuing its TRO and preliminary injunction, the district court did not cite any statute that vests a court with authority to determine which aliens should (and should not) be detained. *Cf.* 8 U.S.C. § 1226(e).

The disruptive effect of the district court's orders, moreover, would long survive the COVID-19 pandemic. The preliminary injunction's prohibition on increasing the net number of detainees "more than minimally" at the Facilities particularly harms the public interest because it will prevent ICE from taking into custody dangerous aliens for purposes of removal. *See* Order 2 at 8 (ER 18). The public interest is served far better by allowing medical professionals and other staff at the Facilities to implement the CDC's procedures and protocols to protect detainees from exposure to COVID-19. *See* Declaration of Capt. Jennifer Moon (Mar. 27, 2020) ("Mesa Moon Decl."), Dkt. 37-2 ¶ 3 (ER 222); Declaration of Capt. Jennifer Moon (Mar. 26, 2020) ("Yuba Moon Decl."), Dkt. 37-4 ¶¶ 3 (ER ), 6 (ER 226). That conclusion is reinforced by the fact that ICE must continue to administer a national system of detention facilities throughout the current pandemic. If the district court's approach to injunctive relief were adopted by other courts, the government would be more widely unable to fully discharge its important statutory duties that advance the public interest because such relief would supplant Congress's statutory mandates regarding which aliens must, or should, be subject to detention before, during and after removal proceedings. *See* 8 U.S.C. §§ 1225(b)(2), 1226(a), 1226(c), 1231(a)(2), 1231(a)(6). In this regard, the TRO, preliminary injunction and bail orders override the Facilities' and ICE's well-tailored measures to prevent and contain COVID-19, intrude into the day-to-day administration of detention facilities, disregard the realities of detention, and disparage broadly the operations of facilities that at the time of the preliminary injunction still had no confirmed COVID-19 cases among detainees. *See, e.g.*, *Valentine v. Collier*, 956

F.3d 797, 803-04 (5th Cir. 2020); *see also id.* at 805 n.2 (describing the CDC's "ever-evolving" response to the pandemic); *Wilson v, Williams*, 961 F.3d 829, 833 (6th Cir. 2020) (describing BOP's appropriately phased approach as the pandemic unfolded); *Swain v. Junior*, 958 F.3d 1081, 1090 (11th Cir. 2020) (describing the pandemic as requiring a response to "rapidly evolving" and "unprecedented" circumstances).

In short, the district court failed to give adequate consideration to the harm its TRO, preliminary-injunction order, and bail orders would cause ICE and the public it serves. In balancing the equities at the TRO stage, the district court stated that "as bail requests are considered, care will be taken to avoid releasing detainees who are a danger to the community and to minimize the possibility that released detainees will fail to appear for their removal proceedings." Order 1 at 5 (ER 76). But in considering whether to issue a preliminary injunction, a district court may not dismiss the government's legitimate interests "in only a cursory fashion." *Winter*, 555 U.S. at 26; *see Adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 760 (9th Cir. 2018) ("The district court's analysis of irreparable harm is cursory and conclusory, rather than being grounded in any evidence or showing offered by [the plaintiff]." (quoting *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013))). Instead, it must give serious consideration to the harm a preliminary injunction would inflict on the government and the public. *See, e.g.*, *Winter*, 555 U.S. at 26 ("The lower courts did not give sufficient weight to the views of several top Navy officers"). The district court failed to do so here.

In light of the serious public interests threatened by plaintiffs' release, plaintiffs' allegations of harm from continued detention do not justify release. According to the district court, plaintiffs demonstrated a strong likelihood of irreparable harm because the Facilities did not sufficiently test detainees for COVID-19 and because detainees continue to be transported from facilities with COVID-19 cases to Mesa Verde and Yuba. Order 1 at 4 (ER 75). The court erred. The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with" the Supreme Court's "characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the Petitioner is entitled to such relief." *Id.* Conclusory or speculative allegations are not enough to establish a likelihood of irreparable harm. *Herb Reed Enters.*, 736 F.3d at 1250. The threat of injury, moreover, must be "immediate." *See Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). Here, at the time of the preliminary injunction, plaintiffs had neither alleged nor presented evidence that COVID-19 has actually spread to any detainees at the Facilities. Indeed, the district court failed to explain how any individual plaintiff had been harmed, let alone how *every* plaintiff had suffered such harm. *See generally* Orders 1 (ER 72-78) and 2 (ER 11-22).

In evaluating the risks to plaintiffs, the district court also failed to consider the substantial mitigating effect of ICE's efforts in combating COVID-19 at the Facilities. *See* Factual Background, *supra* at pp. 7-10 For example, medical staff at

both Facilities examine any detainee who submits a request to see medical staff due to symptoms consistent with COVID-19.  Pham Decl. ¶ 25 (ER 97); Fishburn Decl. ¶ 23 (ER 149).  Detainees who present symptoms consistent with COVID-19 are placed in isolation and tested for COVID-19.  Pham Decl. ¶ 23 (ER 97); Fishburn Decl. ¶ 22 (ER 149).  Trained nurses screen all newly arriving detainees at the Facilities for COVID-19 symptoms, and at Mesa Verde, new detainees are offered COVID-19 testing that provides same-day results.  Pham Decl. ¶ 21 (ER 96); Fishburn Decl. ¶ 20 (ER 148-49); Bonnar Decl. ¶ 8 (ER 81).  Newly arriving detainees who may be at risk due to their travel history are placed in isolation as a precautionary measure at Mesa Verde, Pham Decl. ¶ 22 (ER 96), and all new detainees are placed in a 14-day quarantine at Yuba, no matter their history, Fishburn Decl. ¶ 21 (ER 149).  Plaintiffs accordingly do not face a reasonable prospect of irreparable harm from continued detention, let alone an immediate one.  In addition, plaintiffs receive publicly funded medical care while they are in custody that may be more readily available than if they were released.  Indeed, the risk of harm at the Facilities—where plaintiffs receive free medical care—contrasts with the uncertain risk of harm to plaintiffs if released into the general public.  The district erred in concluding that plaintiffs' claims of irreparable harm outweigh the significant public interests imperiled by plaintiffs' release.

## III.    The District Court Erred In Granting Provisional Class Certification.

The district court also erred in certifying a provisional class.  Order 1 at 2-3 (ER 73-74).

### A.     Plaintiffs Failed to Establish Commonality.

To obtain preliminary class certification, plaintiffs were required to demonstrate that their proposed class was entitled to common relief as to each count on which certification was sought. *See* Fed. R. Civ. P. 23(a)(2), (b)(2). The commonality requirement is especially rigorous when applied to a class that seeks certification under Rule 23(b)(2), because it must show that "a single injunction or declaratory judgment would provide relief to each member of the class." *Jennings v. Rodriguez*, 138 S. Ct. 830, 852 (2018) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011)). The Supreme Court has also questioned whether a Rule 23(b)(2) class action litigated on common facts is an appropriate way to resolve Due Process Clause claims, which are almost always best adjudicated on a case-by-case basis. *Id.*

Here, the class fails to satisfy commonality for two reasons. *First*, class members have vastly different risk profiles for COVID-19 based on age, preexisting conditions, and a host of other factors. *See* CDC, *People Who are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last accessed July 22, 2020). Resolving whether each class member is receiving appropriate protection consistent with his or her individual risk profile and specific medical concerns thus involves "wide factual variation." *Dukes*, 546 U.S. at 530. Here, for example, Plaintiff Coraima Yaritza Sanchez Nunez is 26 years old and has asthma. Nunez Decl. ¶¶ 2, 10 (ER 214, 215). This is different from Plaintiff Javier Alfaro, who is 39 years old, but does not have any other medical conditions that place him at increased risk. *See* Alfaro Decl. (ER

202-211). The district court brushed these concerns aside, discounting the dramatic variation in the risk COVID-19 poses to individual members of the class, and finding that commonality had been established because COVID-19 is "dangerous to everyone." Order 1 at 2-3 (ER 73-74). Yet, in issuing class-wide relief, the district court implicitly acknowledged the necessity of making individualized determinations when it made the particular health risk posed to each detainee by current conditions in the Facilities one of only four factors considered for bail. *See* Order 2 at 2 (ER 12) (bail to be awarded, in part, based upon "the risk posed to the detainee by current conditions at the facilities"). Because the "key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them," *Dukes*, 564 U.S. at 360 (citation omitted)—such "[d]issimilarities within the proposed class" surely defeat commonality, *id*.

*Second*, immigration detention is authorized under differing statutory authorities, which makes considerations regarding detention and release vary from one detainee to the next. *See* Order 2 at 2 (ER 12) (bail to awarded, in part, based upon the likelihood that the detainee will be a danger to the community if released and whether detainees will appear for subsequent immigration proceedings); *see also, e.g.*, 8 U.S.C. § 1225(b) (requiring mandatory detention for recently arrived aliens pending a final determination of credible fear); *id.* § 1226(c) (requiring mandatory detention for aliens who have committed certain criminal offenses); *id.* § 1231(a)(2) (requiring mandatory detention during the 90-day removal period after

a final removal order). For example, some class members have criminal convictions for DUI, *see, e.g.*, Nunez Decl. ¶ 3 (ER 214), and some have criminal convictions for first-degree murder, *see, e.g.*, Dkts. 180-8, 194-8, 206 (Mario Joya Lazo); Dkts. 297-15, 319-15, 335 (Tith Ton). Even where a detainee is eligible for release, ICE must assess whether the detainee is a danger to the community or a flight risk. *See* 8 C.F.R. § 236.1(c)(8). And 8 U.S.C. § 1182(d)(5) grants the Secretary of Homeland Security discretion to "parole [aliens] into the United States temporarily under such conditions as he may prescribe." In these circumstances, plaintiffs cannot show that a single common remedy is appropriate, especially where detention for some is *mandated by statute* and release—even where permissible—requires an assessment of individual health vulnerabilities and dangerousness and flight risk that is necessarily made on a case-by-case basis. That the district court ultimately structured relief on such individualized bases confirms the lack of commonality here. Because plaintiffs cannot meet their burden to demonstrate commonality this Court must deny reverse class certification on that basis alone. *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012) (common issues do not predominate where "an individualized case" must be made on behalf of each class member in order to obtain relief).

In holding otherwise, the district court relied on *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014), and *Brown v. Plata*, 563 U.S. 493 (2011), for the proposition that provisional class certification is not defeated merely because some people, and not others, would need to be released based upon health vulnerabilities and criminal backgrounds. *See* Order 1 at 2 n.2 (ER 73). But in *Parsons*, unlike here, this Court

40

held that a class action based on detention conditions satisfied Rule 23(b)(2) because the remedy sought could apply on a class-wide basis. 754 F.3d at 689. The remedy in *Parsons* was not release of select inmates based on unique criteria; the remedy was a change in policy that would increase access to medical services for *all* class members. *Id.* at 663, 689. By contrast, plaintiffs here asked for and received individualized relief in the form of release for some, but not all, detainees based upon a range of individualized considerations. *Parsons* therefore cannot support the district court's finding of commonality here.

*Plata* did not even involve the habeas statute, but instead concerned a separate statutory scheme, the Prison Litigation Reform Act (PLRA), which contains an express provision authorizing release as a remedy but only by a three-judge court. *See* 18 U.S.C. § 3626(a)(3)(B) (making class treatment appropriate notwithstanding the question of who should be released). Further, the relief ordered in *Plata* does not resemble the bail system, and consequent release, the district court ordered here. The district court in that case issued a series of remedial orders over a period of years "giving ample time" for the State to remedy the ongoing violations, *Plata*, 563 U.S. at 514, 516, and only after "no other remedies had been found to be sufficient," *id.* at 501, did a three-judge court order the State to bring its prison population to within 137.5% of the state prison system's design capacity "within two years," *id.* at 509-10. That relief issued only after multiple alternative remedies had failed, and it did not even necessarily require the State to "release any prisoners" during that additional two-year compliance period. *Id.* at 511. That was so despite the fact that the conditions alleged in that case were so severe that an inmate "needlessly die[d]

every six to seven days due to [the] constitutional deficiencies." *Id.* at 506. The Court's approach in *Plata* contrasts starkly with the remedy demanded and ordered here—the institution of a bail system that resulted in the near immediate release of detainees.

Because plaintiffs failed to satisfy their burden of showing commonality under both Rule 23(a) and (b), the district court should have denied their motion to certify on that basis alone. *See Dukes*, 564 U.S. at 350; *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

### B. Plaintiffs Failed to Demonstrate Typicality.

The district court also erred in concluding that plaintiffs had established typicality. Order 1 at 2-3 (ER 72-73). The commonality and typicality requirements of Rule 23(a) are interrelated and, in some instances, merge. *Dukes*, 564 U.S. at 349 n.5. "Both [requirements] serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.* Because the class members' circumstances and ultimate eligibility for relief were too varied to satisfy the commonality requirement, the district court erred when it concluded that plaintiffs satisfied Rule 23(a)(3).

The different forms of relief that plaintiffs requested demonstrated that plaintiffs could not establish typicality. Plaintiffs requested that the district court order defendants to release some, but not all, class members in order to facilitate social distancing. Plaintiff's First Motion for a Restraining Order 31 ("Pls. TRO

Mot."), Dkt. 5. To do so, plaintiffs proposed, and the district court ordered, implementation of a system where the district court reduced the population based on individualized factors. *Id*. at 7. The proposed relief demonstrated that the individual decision to release any putative class member would be different based on their individual circumstances. While plaintiffs focused their typicality argument on the need for social distancing, Pls. Class Cert. Mot. 15, plaintiffs ignored that their proposed remedy would be vastly different for different class members. As a result, the district court erred in concluding that plaintiffs had established typicality when they sought class wide relief on an individualized basis—a contradiction in terms.

And again, to the extent that the district court relied on *Parsons* to conclude that plaintiffs' had shown typicality that case is readily distinguishable due to the nature of the relief sought. As discussed above, in *Parsons*, this Court concluded that a class action based on detention conditions satisfied Rule 23(b)(2) because the remedy sought was applicable on a class-wide basis. *Parsons*, 754 F.3d. at 689. But the *Parsons* remedy was not release of only some inmates but instead a change in policy that would increase access to medical services for all inmates, relief that this Court found applied to all class members. *Id.* at 663, 689. In contrast, plaintiffs here are not seeking uniform relief, but instead are asking for either release or to be detained in a less populated facility. *See* Complaint at 35 (requesting the district court to "[i]n gross or individually, order Defendants to release enough class members sufficient for the continued detention of any remaining class members not to violate their constitutional rights"). Thus, the relief sought here contrasts sharply

with the relief sought and granted in *Parsons*. As a result, *Parsons* provides no support for plaintiffs' claims for typicality under Rule 23(a).

### C.      Plaintiffs Failed to Establish Adequacy.

In finding that plaintiffs had also shown adequacy, the district court likewise erred. *See* Order 1 at 2-3 (ER 73-74). The named plaintiffs had an inherent conflict of interest with other members of the class who would not be released based on the district court's consideration of their individualized circumstances. Thus, plaintiffs cannot establish adequacy either.

The adequacy requirement serves to protect the due process rights of absent class members who will be bound by the judgment. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998), *overruled on other grounds by Dukes*, 564 U.S. 338. Assessing the adequacy of class representation turns on two inquiries: "(1) do the named Plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the named Plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Id.*

Before the district court, the named plaintiffs sought a reduction in the Facilities' detainee populations, not the release of all detainees. Pls. TRO Mot. 31. They further proposed that the reduction be prioritized by individually assessing each detainee's circumstances, *id.* at 7, with the submission of staggered applications for release until the populations were sufficiently reduced to permit what plaintiffs deem adequate social distancing, *id.* Because release is not possible for all detainees in the class, and because some detainees for whom release is possible pose a flight risk or a danger to the community, the interests of named plaintiffs are adverse to

44

those class members for whom release is not possible, or is less likely. Further, in directing the government to release detainees based upon a bail system predicated on the detainee's individual circumstances, including health and criminal-related concerns, the district court itself confirmed that class members have differing—and inherently conflicting—interests in the choice of who should obtain a release from immigration custody. *See* Order 2 at 1-2 (ER 11-12). And for various reasons— including the availability of no-cost medical care at detention facilities—not all detainees may even desire release, and some detainees may not want to pursue release if they do not have a safe place to go. The district court's orders, therefore, violated *Dukes*' requirement that classwide injunctive relief equally benefit the entire proposed class. 564 U.S. at 360 (Rule 23(b)(2) "does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant.") (emphasis in original). Accordingly, the district court mistakenly found that the named plaintiffs' interests were aligned with all members of the putative class, and, as with commonality and typicality, plaintiffs failed to establish adequacy.

*     *     *

Plaintiffs' failure to establish commonality, typicality, and adequacy require reversal of the district court's provisional class certification in the TRO. The district court's attempt to issue individualized relief through its system of bail confirms that this case was inappropriate for class certification. *See* Order 2 at 1-2 (ER 11-12).

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's TRO, preliminary-injunction order, bail orders, and class certification.

Respectfully submitted,

ETHAN P. DAVIS
*Acting Assistant Attorney General*
SCOTT G. STEWART
*Deputy Assistant Attorney General*
WILLIAM C. PEACHEY
*Director*
JEFFREY S. ROBINS
*Deputy Director*
CHRISTOPHER A. BATES
*Senior Counsel*
WILLIAM K. LANE III
*Counsel*

*/s/ Sergio Sarkany*
SERGIO SARKANY, CA Bar 223584
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration litigation
District Court Section
P.O. Box 878, Ben Franklin Station
Washington, D.C.
Telephone: (202) 598-5624
E-mail: sergio.f.sarkany@usdoj.gov

*Trial Attorney*

Dated: July 27, 2020                    *Attorneys for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,398 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

*/s/ Sergio Sarkany*
SERGIO SARKANY, CA Bar 223584
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration litigation
District Court Section

## STATEMENT OF RELATED CASES
## PURSUANT TO NINTH CIRCUIT RULE 28-2.6

Respondents-Appellants are unaware of any cases currently pending before this Court related to this appeal.

*/s/ Sergio Sarkany*
SERGIO SARKANY, CA Bar 223584
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration litigation
District Court Section

48

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2020, I electronically filed the foregoing document with the Clerk of the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

*/s/ Sergio Sarkany*
SERGIO SARKANY, CA Bar 223584
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration litigation
District Court Section